DocuSign Envelope ID: 6B591842-894D-4B25-BF11-384EAFE50355

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF MISSOURI | Civil Action: _____ |
| **CONNIE JOANN BAKER, INDIVIDUALLY, ON BEHALF OF THE DECEDENT'S CHILDREN, D.J.B AND SHAYLA DANIELLE BAKER, AND ON BEHALF OF THE ESTATE OF DONNELL K. BAKER** | Judge: _____ |
| VERSUS | JURY TRIAL REQUESTED |
| **NATIONAL FOOTBALL LEAGUE INC./ENTERPRISES (NFL) AND LOS ANGELES RAMS** (*formerly St. Louis Rams*) | Magistrate: _____ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiff, **Connie Joann Baker**, individually, on behalf of the decedent's children, **D.J.B** and **Shayla Danielle Baker**, and on behalf of the Estate of Donnell K. Baker, brings this Complaint against **Defendants** and who alleges as follows:

## NATURE OF ACTION

**Plaintiffs** bring this Complaint and Demand for Jury Trial against **Defendants**, **National Football League Inc./Enterprises ("NFL")** and the **Los Angeles Rams** to obtain redress for **Donnell Baker**, who was injured, incapacitated, and died as a result of **Defendants'** reckless disregard for his personal health and safety as a professional athlete for the above-named **Defendants**. **Plaintiffs** alleges as follows:

## PARTIES

1. **Plaintiffs** bring this action, individually and on behalf of the Estate of Donnell Baker (*hereinafter referred to as "**Estate**"*). **Plaintiff Connie Baker** (*hereinafter referred to as "**Mrs. Baker**"*) is a resident of the State of Louisiana, and **Donnell** was domiciled in the State of

Louisiana when he died. Donnell's children are residents and are domiciled in Louisiana (*hereinafter referred to as "**Heirs**"*).

2. The **Defendant**, **National Football League Inc./Enterprises** (*hereinafter referred to as* "**NFL**"**),** is an incorporated professional United States football League with its principal place of business located 345 Park Avenue New York, NY 10154. Defendant **NFL** conducts business throughout this District, the State of California, and the United States.

3. The **Defendant, Los Angeles Rams** (*formerly St. Louis Rams*), (*hereinafter referred to as* "**Rams**"), a domestic corporation limited liability company whose headquarters is located at One Metropolitan Square Suite 3000, St. Louis, Missouri, 63102.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over **Plaintiffs'** claims under 28 U.S.C. §1332.

5. This Court has personal jurisdiction over **Defendants** as **Defendants** conduct significant business in this District, including establishing consumer and business contracts here and because the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated in this District.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to **Plaintiffs'** claims occurred in this district.

## FACTUAL ALLEGATIONS

### Defendants Had A Duty To Protect Mr. Baker

7. The National Football League (hereinafter known as "**NFL**") is the main professional football league in the United States. It consists of thirty-two teams, split evenly between the

American Football Conference (hereinafter known as "**AFC**") and the National Football Conference (hereinafter known as "**NFC**"). The **Rams** are a member of the NFC.

8. The **NFL** is by far the premier sporting organization in the United States and brings in billions of dollars in revenue each year. This revenue comes directly and indirectly from the literal blood, sweat and tears of its players. It's an extremely physical game which includes almost constant tackling, body, and head shots. Due to the very nature of the game, it would be assumed that the **NFL** and its respective Conferences would do everything in its power to ensure the safety and well-being of its players. However, it is clear that the **NFL** and its Conferences have not protected their players to the best of their ability.

9. **Mr. Baker** trusted the authority and guidelines used by the Defendants to protect his health and well-being by treating and preventing head-related injuries including the terminal effects of those injuries later in life.

10. The **NFL** and the **Rams** were all in a much better position than **Mr. Baker** to recognize and mitigate the risks of concussions and head trauma while playing football. However, they failed to do so.

### Studies Establish The Dangers Associated With Concussions And Head Trauma In Sports, Including Football

11. CTE is a neurodegenerative brain disorder which is caused by repetitive trauma to the head, most commonly seen in athletes. The first description of CTE was in 1928 by Dr. Harrison Martland while he was observing a group of boxers. He termed the symptoms of CTE as "punch drunk syndrome." Researchers over the next 75 years found CTE symptoms in boxers and brain trauma victims but less than 50 confirmed cases were reported during that span of time. In 2005, Dr. Bennet Omalu studied the brain of former Pittsburgh Steeler Mike

Webster and subsequently published the first evidence of CTE in an American football player. Symptoms of CTE are not uniform and present themselves in differing degrees of severity and over varying lengths of time. Some of the most common symptoms include: memory loss; confusion; changes in personality; erratic behavior such as aggression, depression and suicidal thoughts, problems with paying attention and difficulty with balance and motor skills. Many of which, **Mr. Baker** did present signs of prior to his death.

12. CTE found in football players was not researched extensively until the 2000s. However, the problem of CTE in athletes that played in high-impact sports was clearly known maybe decades beforehand. The NFL, however, was making excuses for concussions and head trauma in their sport as far back as 1994 – the same year that **Mr. Baker** began his NFL career.

13. In 1994, the Commissioner of the **NFL**, Paul Tagliabue, created the Mild Traumatic Brain Injury committee and appointed Dr. Elliott Pellman as the chair of the committee – even though Dr. Pellman was not highly versed in brain science. Dr. Pellman was even cited as saying in an interview with the magazine *Sports Illustrated*, "concussions are part of the profession, an occupational risk." This negligent indifference to concussions/head trauma in the sport were not confined solely to the weak Mild Traumatic Brain Injury committee; it was a belief that Commissioner Tagliabue himself held and impressed upon the profession.

14. In late 1994, the Commissioner stated, "On concussions, I think is one of these pack journalism issues, frankly… There is no increase in concussions, the number is relatively small… The problem is a journalist issue." In 1997, The American Academy of Neurology updated their guidelines and suggested that any football player that received a concussion during game play should be removed from the field if the player lost consciousness or had any concussion symptoms 15 minutes after the injury occurred. In the same report, the Academy

stated, "Repeated concussions can cause cumulative brain injury in an individual over months or years."

15. In 1999, the NFL Retirement Board ruled that Mike Webster, a former Pittsburgh Steelers and Kansas City Chiefs player, was permanently disabled from repeated concussions. Mr. Webster's attorney stated, "It's pretty devastating evidence," he said. "If the NFL takes the position that they didn't know or weren't armed with evidence that concussions can cause total disability — permanent disability, permanent brain injury — in 1999, that evidence trumps anything they say." However, this ruling was kept secret until it was uncovered by journalists. When Mr. Webster died in 2002, Dr. Bennet Omalu examined his brain and discovered the first definitive evidence of CTE in football players. Irresponsibly and astonishingly, in 2004, the NFL's Mild Traumatic Brain Injury (MTBI) committee attempted to downplay the severity of concussions in players – even going as far as stating, "players who ultimately play in the **NFL** are probably less susceptible to MTBI and prolonged post-concussion syndrome than the general population." Over the next several years, numerous former **NFL** players committed suicide including Andre Waters and Terry Long.

16. Dr. Omalu studied both of their brains postmortem and discovered CTE. This evidence, however, was not enough for the **NFL** to take action to protect its number one asset: its players. In fact, the **NFL** tried to downplay the risk as much as possible; for example, even after a report from the University of Michigan's Institute for Social Research (which was commissioned by the **NFL**) linked dementia, Alzheimer's, and other memory loss related diseases to retired football players at a rate of 19 times the national average. It was not until the end of 2009 that the **NFL** finally acknowledged that concussions actually did pose long-term effects for players when spokesman Greg Aiello stated in an interview with *The New York*

*Times*, "It's quite obvious from the medical research that's been done that concussions can lead to long-term problems," This gross negligence is inexcusable.

### NFL And Rams Breached Its Duty To Donnell Baker By Failing To Take Research Seriously And Failing To Implement Adequate Concussion Management Guidelines

17. While playing football as a wide receiver for the Los Angeles Rams, **Mr. Baker** suffered concussions as well as numerous sub-concussive hits to the head while practicing and during game play. During the time that **Mr. Baker** was an active player in the **NFL**, the **League** and the **Rams** did not meet the duty of care required of it by protecting its employees, including **Mr. Baker**, from extreme harm. In fact, it can be argued that the **NFL** and the **Rams** actually did more to ensure that its players, including **Mr. Baker**, were kept in harm's way by downplaying the risk associated with the game as well as failing to thoroughly pay attention to the research and the growing evidence that concussions and head trauma were causing unnecessary risk to its players/employees.

18. It wasn't until 2009-2010 that the **NFL** began to have adequate guidelines and policies in place to address concussions and how teams should respond. Unfortunately for **Mr. Baker**, this change in tone was over 13 years after he played his final **NFL** game and was already adversely affected and suffering life threatening terminal illnesses as a result.

### Facts Specific To Donnell Baker

19. Donnell Baker played professional football for the **NFL** from 1994 to 1998 and as a player for the Los Angeles Rams from December 1996 to September 1998, with a brief 2 month interruption. During his career, **Mr. Baker** participated in dozens of football games, practices, and scrimmages. While playing football in the **NFL** and for the **Rams**, **Mr. Baker** was knocked unconscious, and suffered numerous concussions. He was also subjected to countless sub-

concussive hits as part of routine practice and game play. Unfortunately, the **NFL** and for the **Rams** failed to provide appropriate medical treatment for these incidents.

20. Since the earliest days of the **NFL**, through at least 2010, there were no adequate or substantial concussion management protocols or policies in place to address and treat concussions sustained by **Mr. Baker** (and others) during practice and in games.

21. Later in life, **Mr. Baker's** mental and physical health began to decline. He began suffering symptoms of depression, mood swings, and seizures. **Mr. Baker** underwent multiple emergency room visits as a result.

22. Eventually this pushed **Mr. Baker** to seek out treatment from a neurologist, with whom he had several appointments. Upon information and belief, it was from these appointments that it was discovered that the seizures **Mr. Baker** suffered from were caused from concussions and head trauma he had endured during his time as a professional football player.

## Mr. Baker's Injury

23. Upon information and belief, sometime during **Mr. Baker's** professional career, he began exhibiting signs of declining cognitive abilities. Subsequently, **Mr. Baker** was diagnosed with seizures which were caused from repeated hits to the head from his time playing professional football. Consequently, these seizures were life changing for **Mr. Baker.** After his **NFL** career ended, **Mr. Baker** became a network manager for a technology company which required him to frequently drive to fulfill the requirements of his job. However, the seizures that **Mr. Baker** would experience would affect him to the point where he would be required to not drive for weeks and months at a time. This clearly had a huge effect on his well being and the ability for him to lead a normal life and provide for his family.

24. **Mr. Baker** would also go through periods where he exhibited symptoms of depression and mood swings. Moreover, despite the fact that **Mr. Baker** adamantly attempted to live a healthy lifestyle, the injuries he sustained from his time playing professional football made this effort futile.

25. Specifically, **Mr. Baker** would regularly go to the gym and workout with his wife. In fact, the morning he died, after dropping off his son at school, **Mr. Baker** was supposed to meet his wife at the gym during their normal time for a workout. However, **Mr. Baker** never dropped his son off at school nor did he ever arrive at the gym.

26. At some point, **Mrs. Baker** began to inquire as to **Mr. Baker's** delayed arrival. Consequently, **Mr. Baker** never arrived. It was later discovered that **Mr. Baker** had died in his sleep that morning as a result of a seizure, while his son was still asleep in the adjacent bedroom.

27. **Mr. Baker** would regularly have both documented and undocumented seizures in his sleep and after several emergency phone calls to 911, **Mrs. Baker** was advised that there was nothing that the medical providers could do and that she would need to let the seizure run its course.

28. Unfortunately, on February 5, 2020, **Mr. Baker**'s seizure, in running its course, would prove to be fatal as it resulted in his death.

## CAUSE OF ACTION
## NEGLIGENCE - WRONGFUL DEATH

29. **Plaintiffs** incorporate by reference the foregoing allegations.

30. From its inception and by virtue of its role in American football, the **NFL** and the **Rams** have historically assumed a duty to protect the health and safety of all its employees/players,

including **Mr. Baker**. The **NFL** and the **Rams** also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its teams, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its players.

31. The duties of the **NFL** and the **Rams** included an obligation to supervise, regulate, and monitor the rules of the League and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to **NFL** football players, including **Mr. Baker**.

32. The **NFL** and the **Rams** had a duty to educate each team's football players on the proper protocol to evaluate and treat TBI during football games and practices, including repetitive concussive and sub-concussive injury. The **NFL's** and the **Rams'** duties further included a duty to warn its players of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played professional football, and as additional information came to light.

33. The **NFL** and the **Rams** had a duty not to conceal material information from professional football players, including **Mr. Baker**.

34. The **NFL** and the **Rams** breached its duties owed to **Mr. Baker** by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker room, and in the weeks and months after they sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings included, but are not limited to:

    a) failure to recognize and monitor concussive and subconcussive injury during football practices and games;

    b) failure to properly inform players of the dangers of concussive and sub-concussive injuries;

    c) failure to implement adequate policies and guidelines for players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

    d) failure to implement procedures to adequately monitor the health of players after they sustained (or were suspected of sustaining) concussive and/or subconcussive injuries;

    e) failure to provide adequate notification, warning and treatment for latent neuro-cognitive and neurobehavioral effects of concussive and sub-concussive injuries, after the players left the **NFL**.

35. Further, the **NFL** and the **Rams** breached its duties to players by failing to disclose and/or failing to recognize and/or being willfully non-observant of information regarding long term effects of repetitive head trauma; the dangers of concussive and sub-concussive injuries; proper ways to evaluate, treat and avoid concussive and sub-concussive injuries to players. The data and information was available, yet the **NFL** and the **Rams**, its physicians, and the members of the Mild Traumatic Brain Injury committee decided to overlook, downplay, and flat out deny any report or information which shed light on the real and devastating effects that concussions had on people – including their own players.

36. **Mr. Baker** experienced repetitive concussive and sub-concussive impacts during his football career, which significantly increased his risk of developing neurodegenerative disorders and diseases.

37. The repetitive head accelerations and hits to which **Mr. Baker** was exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the **NFL's** and the **Rams'** negligence and concealment, the risk of harm to **Mr. Baker** would have been materially

decreased. Thus, as a direct and proximate result of the **NFL's** and the **Rams'** negligence, **Mr. Baker** sustained serious injuries and death.

38. As a result of their negligence, the **NFL** and the **Rams** are liable to **Plaintiffs** for the full measure of damages and other relief allowed under applicable law.

## NEGLIGENCE - SURVIVAL ACTION

39. **Plaintiffs** incorporate by reference the foregoing allegations.

40. From its earliest days and by virtue of its role as the leading governing body in American professional football, the **NFL** and the **Rams** have historically assumed a duty to protect the health and safety of its players, including **Mr. Baker**. The **NFL** and the **Rams** also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its various teams, and to provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its players.

41. The duties of the **NFL** and the **Rams** included an obligation to supervise, regulate, and monitor the rules of the League and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to its players, including **Mr. Baker**.

42. The **NFL** and the **Rams** had a duty to educate players on the proper ways to evaluate and treat TBIs during football games and practices, including repetitive concussive and sub-concussive injury. The **NFL's** and the **Rams'** duties further included a duty to warn its players of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played professional football, and as additional information came to light.

43. The **NFL** and the **Rams** had a duty not to conceal material information from players, including **Mr. Baker**.

44. The **NFL** and the **Rams** breached its duties owed to **Mr. Baker** by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker room, and in the weeks and months after they sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings included, but are not limited to:

    (a) failure to recognize and monitor concussive and sub-concussive injury during football practices and games;

    (b) failure to inform players of the dangers of concussive and sub-concussive injuries;

    (c) failure to implement return to play regulations for players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

    (d) failure to implement procedures to monitor the health of players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

    (e) failure to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, including after their professional careers.

45. The **NFL** and the **Rams** breached its duties to **Mr. Baker**, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; the dangers of concussive and sub-concussive injuries; and the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including **Mr. Baker**.

46. As a professional football player in the **NFL** and the **Rams**, **Mr. Baker** relied upon the guidance, expertise, and instruction of the **NFL** and the **Rams** in understanding risks associated with the serious and life-altering concussive and sub-concussive hits in football.

47. At all times, the **NFL** and the **Rams** had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to players, including **Mr. Baker**, the **NFL** and the **Rams** knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while playing professional football and thereafter.

48. Repetitive TBIs during football practices and games have a pathological and latent effect on the brain. Repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially at an early age.

49. **Mr. Baker** experienced repetitive concussive and sub-concussive impacts during his professional football career, which significantly increased his risk of developing neurodegenerative disorders and diseases The repetitive head accelerations and hits to which **Mr. Baker** was exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the **NFL's** and the **Rams'** negligence and concealment, the risk of harm to **Mr. Baker** would have been materially decreased.

50. Thus, as a direct and proximate result of the **NFL's** and the **Rams'** negligence, **Mr. Baker** incurred damages in the form of permanent brain damage, emotional distress, medical costs, health care, secondary care, other out-of-pocket expenses, lost time, lost earnings, and other damages.

51. As a result of their negligence, the **NFL** and the **Rams** are liable to **Plaintiffs** for the full measure of damages and other relief allowed under applicable law.

## BREACH OF IMPLIED CONTRACT

52. **Plaintiffs** incorporate by reference the foregoing allegations.

53. To the extent that an express written contract cannot be established between the **NFL**, the **Rams** and **Mr. Baker**, the facts set forth support the finding of an implied contract.

54. Under the implied contract, **NFL** and the **Rams** players, including **Mr. Baker**, agreed to be bound by **NFL** rules and regulations in exchange for their participation in League teams and games, including the St. Louis Rams. As a condition of the implied contract, the **NFL** and the **Rams** agreed to abide by the promises set forth in its own Agreements and Bylaws.

55. **Mr. Baker** indicated his acceptance of the contract, and further, fully performed under the contract, by participating as a player in accordance with **NFL** rules and regulations.

56. The **NFL** and the **Rams** breached its implied contractual duties by failing to ensure **Mr. Baker** was provided with a safe environment in which to participate in football activities. The **NFL** and the **Rams** further breached its contract by concealing and/or failing to properly educate and warn **Mr. Baker** about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

57. The **NFL's** and the **Rams'** breach caused **Mr. Baker** to suffer physical injury and damages in the form of, *inter alia*, past medical expenses, other out-of-pocket expenses, lost time, lost earnings, and other damages, including death.

58. As a result of its misconduct, the **NFL** and the **Rams** are liable to **Plaintiffs** for the full measure of damages and other relief allowed under applicable law.

## RESTITUTION
### (In the Alternative to Breach of Contract)

59. **Plaintiffs** incorporate by reference the foregoing allegations.

60. The **NFL** and the **Rams** receives, and during **Mr. Baker**'s participation as a player in the Carolina Panthers, Jacksonville Jaguars, and Los Angeles Ram's (*formerly known as St. Louis Rams*) football teams received, significant revenues from the football played by its employees/players. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

61. The **NFL** and the **Rams** appreciates and has knowledge of such benefits.

62. Under principles of equity and good conscience, the **NFL** and the **Rams** should not be permitted to retain the profits received at the expense of **Plaintiffs**, due to its unlawful misconduct or otherwise failing to prevent such injuries as described above.

63. **Plaintiffs** seek restitution and/or disgorgement of all monies the **NFL** and the **Rams** has unjustly received as a result of its misconduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, **Plaintiffs**, individually and on behalf of the Estate of Donnell K. Baker, respectfully requests that the Court enter an Order providing for the following relief:

A. Declare that **Defendants** actions, as set out above, constitute negligence and breach of contract;

B. Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by **Defendants** conduct, including without limitation damages for past medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, death, and other damages;

C. Award **Plaintiffs** restitution and/or disgorgement of all monies **Defendants** have unjustly received as a result of its misconduct alleged herein;

D. Award **Plaintiffs** reasonable litigation expenses and attorneys' fees;

E. Award **Plaintiffs** pre- and post-judgment interest, to the extent allowable;

F. Enter injunctive and/or declaratory relief as is necessary to protect the interests of **Plaintiffs**; and

G. Award such any other and further relief as equity and justice may require.

*DocuSigned by:*
*Connie Baker*
8468A957341047F

**Connie Baker, Pro Se**
451 Oakford Dr.
Baton Rouge, Louisiana 70815
225-266-7920
**Pro Se Plaintiff**